KING v. VAN SLACK.

1. CARRIERS—CONTRACTS—PAYMENT OF FREIGHT BY CONSIGNEE.
   It was lawful for a carrier to agree with the shipper, at
   the time of receiving the goods, that the carrier would
   collect the freight from the consignee.

2. SAME—BILL OF LADING—OWNER OF GOODS.
   Upon shipment of goods through a carrier to a third party,
   and a delivery to the shipper of the bill of lading, the
   consignee is *prima facie* the owner of the property.

3. SAME—ACTION FOR FREIGHT CHARGES—LIABILITY OF SHIPPER.
   Where defendants shipped goods under an agreement with
   the carrier and the consignee that the freight charges
   should be paid by the consignee, and the goods were de-
   livered and the charges demanded collected, the consignee,
   and not the shippers, became liable for the difference be-
   tween the amount demanded and the true legal rate.

Error to Gratiot; Searl, J. Submitted June 21, 1916.
(Docket No. 44.) Decided September 26, 1916.

Assumpsit by Frank W. Blair, Dudley E. Waters,
and Samuel M. Felton, receivers of the Pere Marquette
Railroad Company, against C. E. Van Slack and others
for freight charges. Paul H. King was by stipulation
substituted as plaintiff for Mr. Felton, and when Mr.
Blair resigned his name was dropped, leaving as plain-
tiffs Paul H. King and Dudley E. Waters. Judgment
for defendants on a verdict directed by the court.
Plaintiffs bring error. Affirmed.

*Parker, Shields & Brown* (*Seward L. Merriam,
John C. Bills* and *J. T. Matthews,* of counsel), for ap-
pellants.

*Fred J. Northway* (*Edwin H. Lyon,* of counsel), for
appellees.

STONE, C. J. This is a suit in assumpsit to recover the balance of freight charges on shipments of butter made by defendants from Breckenridge, Mich., a point on the Pere Marquette Railroad, to New York, Boston, and other eastern points, all outside the State of Michigan. The bill of particulars covers a period from about May 1, 1909, to about September 1, 1913.

On the trial it appeared that for some time prior to May 1, 1909, to December 31, 1910, the Breckenridge Creamery Company was a partnership composed of all the defendants; that on December 31, 1910, defendant Obert severed his connection with the company, from which time until October 15, 1913, defendants Eldridge and Van Slack continued the business as partners. The plaintiffs therefore elected to proceed against all of the defendants for the period covered by the bill of particulars up to December 31, 1910. Plaintiffs claim for balance of correct amount of freight charges according to the lawfully filed and published tariffs in effect at the time, $345.85.

The suit was started in the name of Frank W. Blair, Dudley E. Waters, and Samuel M. Felton, receivers, but subsequently Mr. Blair and Mr. Felton both resigned, and Mr. Paul H. King was appointed as receiver in place of Mr. Felton. No appointment was made to fill the place made vacant by the resignation of Mr. Blair. By stipulation duly filed Mr. King was substituted as plaintiff for Mr. Felton, and when Mr. Blair resigned his name was dropped as one of the parties, leaving as plaintiffs Paul H. King and Dudley E. Waters, as receivers.

The shipments were made by defendants upon ordinary straight bills of lading (a sample of which is attached to the record), about 75 per cent. of which were prepared and signed by the defendants at their office, and presented to the carrier's agent; the balance being made out at the station. Defendants, in making the

sales of the butter covered by the shipments in the bill of particulars, invariably made arrangements to sell their output in advance of the time when they made shipments.

By the terms of their agreements with the consignees, defendants were to deliver the butter to the carrier (plaintiffs) at Breckenridge, and the consignees were to pay the freight at destination, upon the various shipments. All shipments of butter made by defendants during the time covered by the bill of particulars to the various consignees named therein were made in pursuance of and according to those arrangements. On each package of butter covered by the bill of particulars there was marked the net weight of the butter and the tare, making up the total gross weight of shipment. Defendant Fred L. Eldridge had charge of that part of the business, and had personal knowledge of the making of each and all of the shipments referred to in the bill of particulars. He was called under the statute for cross-examination, by the plaintiffs, and testified, without contradiction, as follows:

"For a time I billed all of the 60 pound tubs, so called, at 60 pounds. Then Mr. Fea (plaintiffs' agent) instructed me to bill them at 72 pounds. I do not know when this was. I am unable to state whether or not that was after the time we began to use the larger tubs that I have spoken of. I weighed, or knew of the weighing of each of these tubs or other packages of butter shipped, and covered by the bill of particulars in this case, and that the exact and substantially precise weight of each package, both as to net weight of the butter, and the weight of the package itself, was placed upon the outside of the package. I am not able to say now what the exact weight of any one shipment was. During all the time that the railroad company had the shipment in its possession as a carrier it had that means of information before it, to determine the exact weight, from reference to the tubs. It made not

a penny's difference to me whether the tubs were billed at 60 or 73 pounds. I simply billed them as directed by Mr. Fea, the local agent of the Pere Marquette Railroad Company.

"*Q.* And did you at any time during the time of the shipments covered by this bill of particulars either look yourself at any ruling or regulation of the Interstate Commerce Commission, or were you otherwise informed that the requirements of the Interstate Commerce Commission were otherwise than you were directed by Mr. Fea to bill the goods?

"*Plaintiffs' Counsel:* I object to that as immaterial. He may have been informed as to the rulings of the Interstate Commerce Commission.

"*Defendants' Counsel:* It is a negative, that he had no information on that subject.

"*The Court:* Do you think it is important here to show that—they propose to show that he didn't enter into any agreement to rebate.

"*Defendants' Counsel:* I propose to show his good faith.

"*Plaintiffs' Counsel:* He wants to get out from under that. It is irrelevant and incompetent in this case.

"*The Court:* You claim he is liable whether he entered into the agreement or not?

"*Plaintiffs' Counsel:* Certainly; whether he knew or not. We are not trying Mr. Eldridge on an indictment for underbilling. We are seeking to collect freight charges, and his knowledge or lack of knowledge cuts no figure under the issues in this case. &ast; &ast; &ast;

"*The Court:* I think the testimony is competent. (Exception by plaintiffs' counsel.) &ast; &ast; &ast;

"*A.* I was not.

"*Q.* And whether or not in making these shipments at 60 pounds for 60 pound tubs, and the other weights that you shipped them at, whether or not you acted in good faith?

"*A.* I did."

C. W. Fea was the local agent of plaintiffs at Breckenridge at the time of the commencement of these shipments, and remained such agent, and in charge of its office there, during the time of all the shipments involved in the case. At the commencement of the

shipments Mr. Eldridge called the attention of said agent of plaintiffs to the fact that the net weight and the tare, showing the gross weight, were marked on each one of the packages, and Mr. Eldridge also asked him to weigh the butter, in case any question arose as to his stating the total weight of the shipments upon the packages, to which the agent replied that he had no time to do anything of that sort. Fea instructed Eldridge, prior to the first shipment mentioned in the bill of particulars, to bill the tubs of butter at 60 pounds per tub, and Eldridge followed his directions, and the same was true of the small tubs, packages, and boxes. Defendants did not pay freight in advance upon any of those shipments, and were never asked to pay in advance.

Upon the subject of the agreement with the plaintiffs to ship the butter subject to freight charges, Mr. Eldridge testified as follows:

"*Q.* About the time you began making shipments to the East did you have a talk with Mr. Fea, the local agent, in reference to the shipments, and payment of freight and so forth?

"*A.* Yes, sir; that was the first day we were in business. * * *

"*Plaintiffs' Counsel:* I object to that as immaterial and irrelevant, and for the further reason that no authority on the part of the agent has been shown, and as matter of fact he didn't possess any authority to bind the defendant.

"*The Court:* I don't think it is irrelevant, and it is material, unless you are right upon your proposition of law that, no matter what bargain they made, they could not change the law.

"*Plaintiffs' Counsel:* That is the basis of my objection so far as the materiality and relevancy is concerned.

"*Defendants' Counsel:* If that arrangement is not forbidden by the interstate commerce act, and I say that it not from an examination of the act and the amendments, that the railroad company carrying un-

der that arrangement cannot accept part of the contract which makes in its favor, and seek to get rid of the rest.

"*The Court:* So far as the authority of the agent is concerned, if he was there in charge of the office, it would be presumed that he had the right to make arrangements to ship goods, within the law at least. He may answer the question.    *    *    *

"*Defendants' Counsel:* I propose to show such facts and circumstances as will show that the arrangement and agreement was that the company was not to look to the consignor, the Breckenridge Creamery Company, but to the consignees, or to their lien upon the freight for the freight; and that agreement is not in violation of the interstate commerce act.

"*The Court:* He may answer. (Exception.)    *    *    *

"*A.* I said to him that we had a shipment of butter, and we wished to ship it, collect, charges to be paid at the other end, and asked him if it was all right, and he replied that it was.

"*Q.* Was it shipped that way?

"*A.* It was.

"*Q.* And did he ever notify you to the contrary in any shipments after that?

"*A.* He did not.

"*Q.* Was there any other or different arrangement made between you and the company or the agent of the company at Breckenridge in reference to these shipments, except that they were to be shipped, and the freight collected at the other end?

"*A.* There was not."

This evidence was uncontradicted.

All of the shipments in question were made f. o. b. Breckenridge, and defendants then made draft on the consignee for 60 per cent. of the selling price, and received the remainder from the consignee when the shipments reached their destination.  The Pere Marquette Railroad Company did not reach the destination of any of the shipments in question with its own lines, but delivered them to the next connecting line at Suspension Bridge, N. Y.  Upon issuing the bills of lading referred to, plaintiffs would make out a way-

bill, and send this forward with the goods, first turning it over to the conductor who picked up the goods, and it being turned over with the goods to the connecting carrier. Plaintiffs did not offer any evidence showing the weights of the shipments in question, either as to the weights of the butter or the weights of the tubs, and on that question the following occurred on the trial:

"*The Court:* *   *   * You haven't shown yet that a dozen people didn't weigh these tubs. The law presumes that they were weighed. Does the railroad company take the weight of the shipper, under the interstate commerce law?

"*Plaintiffs' Counsel:* They have the right to weigh them, or they can take the weight of the shipper, or they can guess at the weight. They are not bound to weigh them, and there is no presumption that they did weigh them, and, as a matter of fact, in this case they were not weighed."

Defendant Eldridge testified, without contradiction, that defendants' books showed the actual weight of the butter, but that there was no way, then, to tell from their books or invoices the total weight of the butter and packages; that defendants did not keep any record of the actual gross weight of the butter and tubs, and that the butter itself weighed from 60 to 62 pounds, and the packages from 8 to 12 pounds; that unsalted butter is lighter than salted butter, and that he could not tell which kind predominated in the shipments, although "as one big guess" he "should imagine about half and half," and that the salted butter would go from 60 to possibly 61 or 63 pounds, and that the salted butter tubs would run from 10 to 11½, and occasionally one up to 12 pounds, while the unsalted or sweet butter tubs would run from 7½ to 9 pounds.

Plaintiffs did not prove the actual weights of the shipments, and conceded that they were not entitled to go to the jury on the actual weights, but claimed the

right to recover upon the basis of the estimated weight of 73 pounds per tub. During all of the time covered by the bill of particulars the tariffs in effect contained the provisions as follows:

"Estimated Weights—Misc.

"Butter or butterine 60 pounds in tub per tub 73 pounds. When actual gross weight of butter, butterine, or eggs received from connecting railroads, or otherwise, are in excess of the estimate weights herein specified, such actual weights shall be charged, and same shall not be reduced to basis of estimate weights.
\* \* \*
"The estimated weights shown in this item will be used when actual weights cannot be ascertained by weighing or otherwise on shipments made locally between all points on the Pere Marquette Railroad, and on shipments from stations on Pere Marquette R. R. to all points on connecting roads to which through rates governed by official classification are in effect."

It appeared that there were no proper scales at Breckenridge with which to weigh the tubs. It is the claim of the plaintiffs that freight charges were assessed and collected from the consignees upon the billed weights of the butter as furnished by the defendants. It is uncontradicted that the goods were all consigned to the purchasers upon whom the drafts were made, and there is no claim that the goods were not delivered to, and received by the consignees, who paid the freight charges then demanded. The conditions printed upon the back of the bill of lading contain the following:

"SEC. 8. The owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery."

At the close of the testimony, upon motion of the defendants, the court directed a verdict for the defendants upon the following grounds, viz.:

(1) That the suit should have been brought by the delivering carrier, and not by plaintiffs.

(2) That neither railroad company could recover of defendants "after having accepted shipment of the goods with the understanding that the charges were to be collected at the other end, and after having released the goods to the consignee, without having collected these extra charges, especially in view of the fact that the actual weight was marked upon each tub of butter."

(3) That the provision in the tariff providing for estimated weight of 73 pounds per tub was not applicable in the case, because the actual weight could have been readily ascertained.

A judgment for the defendants was duly entered. There was a motion for a new trial, which was denied, and exceptions duly taken.

Plaintiffs have brought the case here upon writ of error; and error is assigned upon certain rulings in the admission of testimony, and in the charge of the court, and especially in refusing to direct a verdict for plaintiffs, and in directing a verdict for defendants.

In our view of this case, from the undisputed evidence, it is unnecessary to consider the numerous questions discussed by appellants, for the reason that there is an insuperable obstacle in the way of plaintiffs' right to recover of these defendants. This is not a case where the consignee has refused to accept the goods and pay the freight. It is a case where the consignee has accepted the goods and has paid such charges as have been demanded of him, and is liable to pay such other charges as are legal, upon demand. We have examined the authorities cited and others, and find none against the proposition that it was lawful for plaintiffs to agree with defendants, at the time of receiving the goods in question, that they (plaintiffs) were to collect the freight in question from the consignees. It is not necessary to decide whether such an agreement was, in the first instance, binding upon the consignees. They accepted the goods and paid all

charges demanded. The consignees were *prima facie* the owners of the goods.

"Upon shipment of goods through a carrier to a third party, and on delivery to the shipper of the bill of lading, the consignee is *prima facie* the owner of the property." *Sturges* v. *Railway Co.*, 166 Mich. 231, 239 (131 N. W. 706).

See, also, *Turnbull* v. *Railroad Co.*, 183 Mich. 213, 219 (150 N. W. 132) ; *New York, etc., R. Co.* v. *York & Whitney Co.*, 215 Mass. 36 (102 N. E. 366) ; Hutchinson on Carriers (3d Ed.), §§ 177, 735, 807.

The consignees were, in fact, the owners of the goods, and accepted them and became liable solely to pay the lawful freight. As the carrier is in general entitled to collect freight from the consignee as a condition of delivering the goods, so the consignee who actually received the goods is liable for freight, although it may not have been exacted before delivery. 5 Cyc. p. 501, and cases cited.

No case cited by appellants would authorize the bringing of this action against the consignors upon the facts as disclosed here. There is no evidence that any demand has ever been made upon the consignees, as was the case in *Baltimore, etc., R. Co.* v. *Box & Basket Co.*, 48 Ind. App. 647 (94 N. E. 906, 96 N. E. 28), cited by appellants.

Nothing is claimed by way of bad faith on the part of defendants in underbilling the goods, as appears by the record. It is not a case of double liability. The consignees, the owners, are solely liable, upon this record.

We are of the opinion that the trial court made a proper disposition of the case, and it is unnecessary to consider the other questions discussed by counsel.

The judgment below is affirmed.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.